CONTINENTAL SECURITIES CO. v. INTERBOROUGH RAPID TRANSIT CO. et al.

(Circuit Court, S. D. New York.   December 28, 1908.)

1. PLEADING (§ 214*)—DEMURRER—ADMISSIONS.
    A demurrer admits allegations of fact, but not mere conclusions of fact or law.
    [Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 526½, 527; Dec. Dig. § 214.*]

2. PLEADING (§ 311*)—EXHIBITS—EFFECT.
    Exhibits attached to a bill control the bill so far as their legal effect is concerned.
    [Ed. Note.—For other cases, see Pleading, Cent. Dig. § 945; Dec. Dig. § 311.*]

3. EQUITY (§ 153*)—BILL—REASONING.
    On demurrer to a bill to avoid an alleged conspiracy in restraint of trade, consisting of a monopoly created by a consolidation of street railway lines, the court could not adopt the reasoning of the bill and its deductions from the facts stated in order to find a conspiracy or monopoly, but must find its existence from the facts alleged.
    [Ed. Note.—For other cases, see Equity, Cent. Dig. § 386; Dec. Dig. § 153.*]

4. MONOPOLIES (§ 20*)—"MONOPOLY."
    Stock Corp. Law N. Y. (Laws 1890, p. 1069, c. 564) § 7, as amended by Laws 1892, p. 1828, c. 688, declares that no domestic stock corporation

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
    165 F.—60

shall combine with any other corporation or person to create a "monopoly" or the unlawful restraint of trade, or to prevent competition in any necessary of life. *Held*, that the word "monopoly" was not used in such section in its strict sense as requiring a control of all present existing means of carrying on a business, or doing a particular thing generally or in a particular place or locality, and the right to possess, own, or control all means of doing that thing in that place in the future, but was satisfied by an exclusive privilege to carry on a traffic or the possession or assumption of anything to the exclusion of other possessors, as where a man has acquired complete control of a business, and therefore embraces any combination or contract the tendency of which is to prevent competition in its broad and general sense.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570–4574.]

5. RAILROADS (§ 1*)—OPERATION—"BUSINESS."

The operation and management of railroads in carrying passengers is a "business," and part of trade and commerce.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 1, pp. 915–923; vol. 8, pp. 7593, 7594.]

6. MONOPOLIES (§ 16*)—STREET RAILROADS—CONSOLIDATION.

Several street railroad companies, including all the railway lines between the points mentioned, operated lines of railway from various points in the Bronx to the Battery in New York City under legislative franchises giving to each an exclusive right to its line and territory. A combination of all of such corporations was effected by means of a transfer of stock to a business corporation created for that purpose by which the real ownership, control, and management of the previous competing parallel lines between substantially the same points or localities was merged. *Held* to constitute an illegal monopoly in violation of Stock Corp. Law N. Y. (Laws 1890, p. 1069, c. 564) § 7, as amended by Laws 1892, p. 1823, c. 688, providing that no domestic stock corporation shall combine with any other corporation or person to create a monopoly or the unlawful restraint of trade or to prevent competition in any necessary of life, and this though the consolidated road is still subject to such control as the New York Public Service Commission may see fit to exercise over it.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

7. CORPORATIONS (§ 377*) — CONSOLIDATION—STOCK CORPORATION LAW — CONSTRUCTION.

Stock Corp. Law N. Y. (Laws 1890, p. 1073, c. 564) § 40, authorizing corporations other than moneyed corporations to purchase, hold, and dispose of stocks, bonds, and other evidences of indebtedness of any other corporation, etc., engaged in a similar business, if authorized to do so by a certificate of incorporation, or if a corporation with which it is authorized to consolidate, is limited by section 7, prohibiting the combination of corporations to create a monopoly, or the unlawful restraint of trade, or the prevention of competition in any necessary of life.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1532; Dec. Dig. § 377.*

Acquisition by corporation of stock of other corporation, see note to Anglo-American Land, M. & A. Co. v. Lombard, 68 C. C. A. 120.]

8. COURTS (§ 366*)—RULES OF DECISION—INTERMEDIATE COURTS OF APPEAL.

A federal court sitting in New York is not required to follow decisions of the different Appellate Divisions on the construction of a state statute

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

merely because they refused appeals to the Court of Appeals, or in the exercise of discretion refused leave to prosecute actions.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 957; Dec. Dig. § 366.*

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

**9. Courts (§ 366*)—Federal Courts—Rules of Decision.**

The lower federal courts are bound by decisions of the highest court of the state in which they are sitting, construing the Constitution or statutes of the state, except when the United States Supreme Court has decided otherwise, but are not bound by state decisions on questions of general commercial law.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 957; Dec. Dig. § 366.*]

**10. Courts (§ 96*)—Federal Courts—Rules of Decision.**

Lower federal courts are bound by the decisions of the Supreme Court of the United States and by those of the Circuit Court of Appeals in their own circuit, but are not bound by decisions of a federal court of co-ordinate jurisdiction, or even the decisions of a federal Circuit Court of Appeals in another circuit.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 327; Dec. Dig. § 96.*]

**11. Words and Phrases—"Comity."**

Comity is not a rule of law, but of practice, convenience, and expediency, and, while it is something more than mere courtesy, its obligation is not imperative.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 2, pp. 1279, 1280.]

**12. Corporations (§ 189*) — Suit by Stockholder — Ninety-Fourth Equity Rule.**

A bill by a stockholder to avoid an alleged illegal consolidation of street railroad companies was verified by the president of complainant company, the president giving the grounds and sources of his information and belief. The bill alleged that complainant was, at and prior to the time of the unlawful plan, combination, and conspiracy objected to, and then was, the bona fide and lawful owner "of record" of 300 shares of the stock of one of the defendants, which was one of the companies alleged to have entered into the combination and alleged conspiracy. The bill then charged that the suit was not collusive to confer jurisdiction on a court of the United States, and that plaintiff had made demand on a specified date on the corporation and its then president and on its board of directors to take steps to dissolve the consolidation, a copy of which written demand was attached. The bill also alleged that the demand was subsequently repeated, and recited in detail the reasons why action was not secured. *Held*, that the bill sufficiently complied with the ninety-fourth equity rule providing that every bill by one or more stockholders of a corporation against the corporation and others founded on rights which might be asserted by the corporation must be verified by oath and must contain an allegation that plaintiff was a shareholder at the time of the transaction of which he complained; that the suit was not collusive to confer federal jurisdiction; and should allege particularly plaintiff's efforts to secure action by the directors of trustees, and, if necessary, by the shareholders, and the cause of his failure.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 721; Dec. Dig. § 189.*]

---

13. CORPORATIONS (§ 189*) — STOCKHOLDERS — ACTION AGAINST CORPORATION—PLEADING.

In an action by a stockholder against a corporation and others, an allegation that complainant is the bona fide and lawful owner "of record" of certain shares of the corporation's stock constituted a sufficient allegation that complainant was a bona fide and lawful stockholder, as the words "of record" did not detract from the force of the statement nor render it evasive.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 721; Dec. Dig. § 189.*]

14. CORPORATIONS (§ 170*)—"SHAREHOLDER."

A shareholder is one who holds or owns a share or shares in a joint-stock or incorporated company in a common fund or in some property, as a shareholder in a railway, mining, or banking company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 624; Dec. Dig. § 170.*

For other definitions, see Words and Phrases, vol. 7, p. 6480.]

15. CORPORATIONS (§ 65*)—"SHARE."

"Share" specifically is one of the whole number of equal parts into which the capital stock of a trading company or corporation is or may be divided, as shares in a bank or shares in a railway.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 165; Dec. Dig. § 65.*

For other definitions, see Words and Phrases, vol. 7, pp. 6473–6475.]

16. CORPORATIONS (§ 60*)—"STOCK."

"Stock" is the share capital of a corporation or commercial company; the fund employed in carrying on of some business or enterprise divided into shares of equal amount, and owned by individuals who jointly form a corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 162; Dec. Dig. § 60.*

For other definitions, see Words and Phrases, vol. 7, pp. 6660–6664; vol. 8, p. 7804.]

17. STREET RAILROADS (§ 58*)—CONSOLIDATION—ACTION—PARTIES—RECEIVERS.

In a stockholder's bill to avoid a consolidation of several street railroads as creating a monopoly, receivers of certain of the roads appointed prior to the commencement of the suit were proper but not necessary parties.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 58.*]

18. STREET RAILROADS (§ 58*)—ILLEGAL COMBINATION—RECEIVERS.

Where certain street railroad corporations entered into an illegal combination and consolidation, the appointment of receivers for two of the constituent companies was ineffective to remove them from the illegal combination.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 58.*]

In Equity. Demurrers by defendants to the bill of complaint.

Stephen M. Yeaman (J. Aspinwall Hodge, of counsel), for complainant.

Cravath, Henderson, & De Gersdorff, for Interborough-Metropolitan Co., Metropolitan St. Ry. Co., New York City Ry. Co., and Metropolitan Securities Co.

Alfred A. Gardner, for Interborough Rapid Transit Co.

Nicoll, Anable, Lindsay & Fuller, for Thomas F. Ryan and others.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

RAY, District Judge.  The Continental Securities Company, a corporation organized and existing under the laws of the state of New Jersey, on its own behalf and on behalf of all stockholders of the defendant Interborough Rapid Transit Company who are similarly situated and who choose to come in, etc., brings this suit in equity against the defendants: (1) To have a certain alleged plan, scheme, and conspiracy set forth in the complaint, and pursuant to which there has been transferred or delivered to the Interborough-Metropolitan Company or to the Windsor Trust Company a large majority of the capital stocks of the Interborough Rapid Transit Company, Metropolitan Street Railway Company, and Metropolitan Securities Company, heretofore entered into by and between, or adopted by, or concurred in by the defendants in this action, adjudged unlawful, null, and void and of no effect, and also to obtain a decree that all acts done under or pursuant to the said plan, scheme, and agreements were and are in violation of the laws and public policy of the state of New York, of the rights of the Interborough Rapid Transit Company, of this plaintiff as a stockholder therein, and of other stockholders similarly situated, and were and are null and void and of no effect.  (2) To have it adjudged and decreed that the transfer and delivery of the large majority of the capital stock of the Interborough Rapid Transit Company to the Interborough-Metropolitan Company, and the deposit with and pledge of said stock to the Windsor Trust Company, was and is illegal, void, and of no effect.  (3) To have it adjudged and decreed that the said Interborough-Metropolitan Company now is, and since a date mentioned has been, an unlawful combination and monopoly in violation of the laws and the public policy of the state of New York, of the rights of the said Interborough Rapid Transit Company, and of those of the complainant and of all other stockholders similarly situated; and also to have a decree that all acts and things done or procured to be done by the said combination and monopoly, or by any of the defendants herein, under or pursuant to the said scheme and conspiracy, are and always have been null and void and of no force or effect.  (4) To have a judgment or decree that a trust agreement entered into March 5, 1906, by and between the Interborough-Metropolitan Company and the Windsor Trust Company pledging the capital stock of the Interborough Rapid Transit Company to secure the payment of certain bonds of the said Interborough-Metropolitan Company, and issued in exchange for shares of the capital stock of the Interborough Rapid Transit Company, was and is illegal, null, and void and of no effect, and that the said bonds were issued illegally and without consideration, and are null and void and of no effect; and to have a decree that all the shares of the capital stock of the Interborough Rapid Transit Company held by the Windsor Trust Company under an agreement made March 5, 1906, belong to and are the property of the holders of certain collateral trust bonds, etc.  Other relief by way of injunction, etc., is also demanded, but such relief and the right thereto is incidental to and dependent upon a right to the main relief demanded.

The defendant companies are New York corporations; defendant Thomas F. Ryan is a citizen and resident of the state of Virginia; the

defendant Lane is a citizen and resident of the state of Massachusetts; and the other individual defendants are citizens of the state of New York.

The defendant Interborough Rapid Transit Company was organized under the railroad law of the state of New York in May, 1902, for the purposes of equipping and operating the Rapid Transit Railroad, which was then a subway being constructed in the city of New York, at the expense of the city, under a contract with one John B. McDonald. The capital stock was fixed at $25,000,000, and $9,200,000 of such stock was subscribed and paid for at par, and $2,200,000 thereof was subscribed and paid for at the rate of $110 per share, and the remainder, or $13,600,000 thereof, was issued for the purpose of acquiring the capital stock of certain other corporations, including that of the Rapid Transit Subway Construction Company, and also the interests of all parties in the lease of the Rapid Transit Railroad theretofore made by the city of New York. In September, 1902, the capital stock of the Interborough Rapid Transit Company was increased to $35,000,000 for the purpose of enabling the company to provide the equipment for the operation of said Rapid Transit Railroad.

Up to the time of the formation of the combination and monopoly alleged in the complaint, the Interborough Rapid Transit Company was engaged in the maintenance and operation of said Rapid Transit Railroad and Subway, commencing at two points in the borough of the Bronx in the city of New York, and running through the borough of Manhattan in the city of New York to the Battery, and up to and including the month of January, 1903, was engaged in actual competition in the business of the transportation of passengers with the Manhattan Railway Company. Up to and including the time of the making of the alleged combination, conspiracy, and monopoly set forth in the complaint, it was also actively engaged in actual competition in the trade or business of operating railroads and transporting passengers in, to, or through the boroughs of Manhattan and the Bronx with the Metropolitan Street Railway Company and the Metropolitan Securities Company and New York City Railway Company, commonly known as the Metropolitan System of Surface Railroads. The Manhattan Railway Company was organized and exists under the railroad laws of the state of New York for the purpose of engaging in the trade or business of operating railroads and transporting passengers on elevated railroads above the streets in the boroughs of Manhattan and the Bronx, and which elevated railroads are parallel to, and until April, 1903, were in competition with, the Rapid Transit Railroad or Subway in the said boroughs operated by the Interborough Rapid Transit Company. In January, 1903, the entire railroad property of the Manhattan Railway Company was leased to the Interborough Rapid Transit Company for the period of 999 years, and since April 1, 1903, the Interborough Rapid Transit Company has operated said elevated railroad under said lease.

The Metropolitan Street Railway Company was organized under the railroad law of the state of New York with a capital stock of $52,000,000, and owns or controls by lease or stock ownership in subsidiary companies all of the passenger railroads operated upon the surface of

the streets within the boroughs of Manhattan and the Bronx in the city of New York, including those owned or leased by the Third Avenue Railroad Company. In February, 1902, all the railroad properties of the Third Avenue Railroad Company were leased to the Interurban Street Railway Company, now known as the New York City Railway Company.

The Metropolitan Securities Company is a corporation organized under the business corporation laws of the state of New York with a capital stock of $30,000,000, and owns all the capital stock of said New York City Railway Company, which was incorporated under the laws of the state of New York with a capital stock of $500,000. In February, 1902, said City Railway Company became lessee of the railroads of the Metropolitan Street Railway Company, including those owned by or leased to said Third Avenue Railroad Company for the term of 999 years from April 1, 1902. The capital stock of the New York City Railway Company has been increased to $20,000,000, and all of its outstanding stock is owned by the Metropolitan Securities Company. From their organization and up to the date of the alleged illegal combination and monopoly complained of, the Metropolitan Street Railway Company, the Metropolitan Securities Company, and the New York City Railway Company were engaged, says the bill, in the maintenance and operation of the trade or business of operating railroads and transporting passengers upon all of the railroads operated upon the surface of the streets in the boroughs of Manhattan and the Bronx, city of New York, and up to that time were actively engaged in actual competition in said trade or business in said boroughs with the Manhattan Railway Company, and since October, 1904, the date of the opening of the Rapid Transit Railroad and Subway, and up to the said formation of the said combination and monopoly, the said metropolitan system of surface railroads was in active competition in the conduct of said trade or business with the Interborough Rapid Transit Company. Each of the railroad companies mentioned operated lines of road from points in the Bronx to the most southern point of Manhattan, known as the Battery, tapping the same territory and reaching common points, and under natural conditions were each and all competitors with each other in the trade or business mentioned, and prior to the combination, conspiracy, and monopoly complained of there was actual competition for business between the systems of the Interborough Rapid Transit Company, including the Manhattan Railway Company, and the system of the Metropolitan Street Railway Company.

The defendant Ryan and his business associates, through ownership of stock in the Metropolitan Street Railway Company and the Metropolitan Securities Company, held by them for several years prior to the alleged illegal combination, controlled and directed the business policy and management of the Metropolitan Street Railway Company and system, including all the street surface railroads engaged in the transportation of passengers in said boroughs of Manhattan and the Bronx.

The defendant Belmont and his business associates, by the ownership of stock in said Interborough Rapid Transit Company held by

them and by virtue of his office as president of said company from its organization and up to the time of the alleged combination and monopoly, have had complete control and direction of the management and business policy of said company, including the trade or business of operating railroads and transporting passengers in the subway and upon the elevated structures in said boroughs of said city.

The illegal combination or conspiracy and agreement complained of is alleged to have been as follows: August Belmont and his associate stockholders of the Interborough Rapid Transit Company, owning or controlling a majority of the stock of that corporation, and Thomas F. Ryan and his associate stockholders of the Metropolitan Street Railway Company and the Metropolitan Securities Company, owning or controlling a majority of the stocks of those companies, acting for themselves as such stockholders, and on behalf of such corporations in which they owned or controlled a majority interest, in or about January, 1906, contriving and intending unlawfully to restrain the trade or business, and injuriously to affect such trade or business, of operating railroads and transporting passengers within the boroughs of Manhattan and the Bronx, city and state of New York, carried on by the Interborough Rapid Transit Company, the Metropolitan Street Railway Company, the New York City Railway Company, and the Metropolitan Securities Company, and (says the bill)—

"intending and contriving unlawfully to create a monopoly of said trade or business of operating railroads and transporting passengers within the boroughs of Manhattan and the Bronx, in the city of New York; and contriving and intending unlawfully to restrain and prevent all competition among said corporations in respect to the necessary transportation of passengers within and through the boroughs of Manhattan and the Bronx, in the city of New York; and intending and contriving unlawfully to deprive the public of the necessary facilities and advantages in the carrying on of such trade or business of operating railroads and transporting passengers, theretofore enjoyed through the independent competition of said corporations—entered into an unlawful combination or conspiracy to effect a virtual consolidation of the Interborough Rapid Transit Company, the Metropolitan Street Railway Company, the New York City Railway Company, and Metropolitan Securities Company, and to place restraint upon all competitive trade or business of operating railroads and transporting passengers within the said boroughs of Manhattan and the Bronx, carried on by them, and to create a monopoly of said trade or business, and to suppress all competition theretofore existing between said corporations in the said trade or business, through the instrumentality of and by the means following, to wit:

"That in or about the month of January, 1906, the defendants Thomas F. Ryan and August Belmont entered into an agreement with one another, whereby they undertook and agreed on their own behalf, and on behalf of their business associates, to effect, or endeavor to effect, in violation of law, a combination or merger of all of the elevated, subway, and street surface railroads engaged in the business of operating railroads and transporting passengers within the boroughs of Manhattan and the Bronx, and thereby to suppress competition in said business, and to create a monopoly thereof."

In pursuance of such scheme to suppress competition, to create a monopoly, and to unite under one control all the trade and business of operating all the elevated, subway, and street surface railroads and transporting passengers within and through the said boroughs, Ryan and Belmont and their associates proceeded and caused to be organized and incorporated, under the business corporation law of the state of

New York, a holding corporation under the name of Interborough-Metropolitan Company, with a capital stock of $15,000, of which $5,000 was preferred stock and $10,000 was common stock, later increased to $55,000,000 of 5 per cent. cumulative preferred stock and $100,000,000 of common stock, and 4½ per cent. collateral trust gold bonds of said company to the amount of $70,000,000 on par value were authorized to be issued with said capital stocks, all to carry into effect the said alleged combination and conspiracy.

This corporation was formed with the intent and purpose of acquiring, and it did acquire in exchange for its own capital stock and certain of such bonds, a large majority of the shares of the capital stocks of the Interborough Rapid Transit Company, the Metropolitan Street Railway Company, and the Metropolitan Securities Company. By such action, and thereupon the independent and competitive use and exercise of the respective rights and franchises of said last-named companies ceased and were abdicated by them in favor of the said Interborough-Metropolitan Company, and all competition between the said subway, elevated, and street surface lines was eliminated, and their respective properties, rights, and franchises merged in and were surrendered to the said Interborough-Metropolitan Company, and the interests of the individual stockholders in said merged companies who participated in said plan in the property and franchises of said companies were terminated, being thus converted (says the bill), "into an interest in the property and franchises of the said Interborough-Metropolitan Company": and the individual stockholders in said companies who exchanged their stocks under the said plan and combination thereupon ceased to hold any interest in the properties, and ceased to draw their dividends from the earnings of the several companies in which they had been stockholders, and became stockholders in the Interborough-Metropolitan Company, with no other right than to draw such dividends as might be collected and distributed by said "illegal combination and monopoly, the holding corporation."

The bill then says:

"In this manner, by making the stockholders of each of the aforesaid corporations jointly interested in all of said corporations, and by practically pooling the earnings of all of said corporations for the benefit of the former stockholders of each, and by vesting the selection of the directors and officers of each of said corporations in a common body, to wit, the pooling corporation, with not only the power, but the duty, to pursue a policy which would promote the interests, not of one corporation at the expense of the others, but of all at the expense of the public, all inducement for competition between the said several systems was removed, and a virtual and unlawful consolidation of the properties, franchises, and business of the said corporations was effected, and an unlawful monopoly of the trade or business of operating all of said railroads and transporting passengers within the said boroughs of Manhattan and the Bronx, which was formerly carried on by each of said corporations as independent competitors was established, in accord with the intent and purpose of the aforesaid combination and conspiracy."

"(10) That in pursuance of the unlawful combination and conspiracy above set forth, and in order to carry the same into effect, the Interborough-Metropolitan Company, in or about the month of January, 1906, entered into an agreement with the defendant August Belmont, whereby the said company agreed to purchase of the said Belmont the capital stock of the Interborough Rapid Transit Company, the Metropolitan Street Railway Company, and Met-

ropolitan Securities Company, or so much thereof as said Belmont could acquire. At the same time said defendant Belmont entered into an agreement with the defendants Edward J. Berwind, John D. Crimmins, Andrew Freedman, Thomas P. Fowler, Gardiner M. Lane, and Cornelius Vanderbilt, acting as a committee, whereby the said Belmont agreed to purchase all the stocks of the aforementioned companies, which might be deposited, under a call for deposit to be issued by said committee, and agreed to pay for such stock and bonds of the Interborough-Metropolitan Company."

The bill then sets out a circular notice and plan proposed and issued by these gentlemen, and states that it was declared operative March 1, 1906. The bill then charges that under the said plan and invitation the Interborough-Metropolitan Company has acquired in exchange for its own stock and bonds, and now holds, "in accordance with the aforesaid combination and conspiracy" and the said plan, a very large majority of the stock (giving figures and amounts) of the Interborough Rapid Transit Company, the Metropolitan Street Railway Company, and the Metropolitan Securities Company, and alleges that by such acquisition of such stocks the defendants Interborough-Metropolitan Company, Belmont, Ryan, Berwind, Crimmins, Freedman, Fowler, Lane, and Vanderbilt—"carried out the unlawful purpose of creating a monopoly of the trade and business of operating all the subway, elevated, and street surface railroads, and transporting passengers within and through the boroughs of Manhattan and the Bronx, and the unlawful purpose of restraining such trade and business, and of destroying all competition therein."

The bill then says:

"(11) The defendant the Interborough-Metropolitan Company, which has, as aforesaid, unlawfully acquired the absolute control and management of all the railroads engaged in the transportation of passengers within the boroughs of Manhattan and the Bronx, was not organized under the railroad laws of the state of New York, but the said company was organized under the business corporations law of the state of New York, for the express purpose of acquiring the capital stock and the control of all the corporations engaged in operating railroads and transporting passengers within and through the said boroughs, and with the preconceived intent and purpose of merging said several corporations and of creating a monopoly in the said business, and of destroying all competition therein, and of controlling, without let, hindrance, or competition, the supply of and facilities for the transportation required by the inhabitants of the said boroughs, and, as your orator is informed and believes, with the preconceived and wrongful intent and purpose of evading and circumventing the restraints and duties which are imposed upon railroad corporations by the laws of the state of New York."

"The said Interborough-Metropolitan Company was not organized in good faith to purchase and pay for the stocks of the said various companies engaged in the aforesaid business, but was organized for the express purpose of pooling and uniting all the stocks of the said other companies, their properties and franchises, under one sole management and control, and to carry into effect the unlawful combination and conspiracy heretofore charged; that said Interborough-Metropolitan Company is a mere depository, custodian, and trustee of the capital stocks of the Metropolitan Street Railway Company, the Metropolitan Securities Company, and Interborough Rapid Transit Company, in exchange for which it has made no payment, but has simply issued against the same the stock and securities of itself—an illegal monopoly—which are in reality but beneficial certificates designating the interests of the various holders in the unlawful monopoly and combination so effected."

The bill, giving facts and figures, then sets out the capitalization of said Interborough Rapid Transit Company, said Metropolitan

Street Railway Company, and said Metropolitan Securities Company, amounting in all to $117,000,000, and alleges that said Interborough-Metropolitan Company had no means or assets to enable it to purchase said stocks for money. The bill then alleges what was done, giving facts and figures alleged to show that the said Interborough-Metropolitan Company issued in exchange for such stocks and some cash its stocks and bonds to the amount of $200,272,600, without any adequate consideration, $90,908,200 of which was issued without any consideration whatever, as there was no increase in property or property values, etc. The bill then proceeds to allege injury resulting from such combination to plaintiff, to other stockholders, and to the public. It contains other allegations to which attention will be called when discussing their sufficiency, viz., allegations as to plaintiff's ownership of stock, collusion, demands upon the corporation for action by it, etc. It is unnecessary to repeat them here.

A demurrer admits allegations of fact, but not mere conclusions of fact or of law. The allegations of this bill are supported by documents, letters, agreements, notices, etc., contained therein or annexed thereto and made a part thereof. These, of course, control so far as their legal effect is concerned. The combination and agreement do not constitute a conspiracy or a monopoly, for the reason they are denominated or denounced as such in the bill of complaint. It is not necessary to cite authority for this proposition. So this court is not to adopt the reasoning of the bill and its deductions from the facts stated, some of which have been quoted, but must take the facts alleged, discarding the matters alluded to.

The facts are set out with considerable detail and particularity, but the gravamen of this bill of complaint is that all the elevated, surface, and subway railway lines of Greater New York, extending from the Bronx to the Battery, a distance of many miles, and affording to the general public and the residents of that city the only means of travel and communication by railroad, whether steam or electric, between those points and to and from all intermediate points, and which had been and naturally are competing lines, entered into a combination, agreement, and so-called conspiracy to unite and merge themselves in one company and line of transportation, and under one head or management, and destroy or do away with the theretofore existing competition between them; that this was done by transfers of stock to one company organized or formed under the business corporation laws of the state of New York, and other means described, and that the purpose and intent was to create a monopoly in the business or trade of operating said parallel and normally competing lines of railway, and of transporting passengers within and through the said territory, the boroughs of the Bronx and Manhattan, city of New York, destroying and doing away with competition in such business in such territory; that such a monopoly, by the means and in the manner described in the bill, actually was created, and that the same was and is injurious to the public, to the residents of the city, and to complainant and all other stockholders similarly situated; and that the acts described and the result accomplished were and are in violation of the statutes of the state of New York, especially of section 7 of the stock corporation

law of said state, and contrary to the public policy of said state as enumerated in its statutes, and that such combination and conspiracy has destroyed competition, restrained trade and commerce, and was and is illegal and void, and should be so declared and thereupon dissolved.

It is not alleged in the bill that the members of this combination have obtained exclusive franchises for the construction and operation of railways through the city of New York from the Bronx, or that neighborhood to the Battery, or that vicinity, or that such franchises are not obtainable or may not be obtained in the future. Hence within the strict definition of "monopoly," if it be that a monopoly must include all present existing means of carrying on a business or doing a particular thing generally, or in a particular place or locality, and the right to possess, or own, or control all means for doing that thing in that place in the future, no monopoly has been created by the combination or conspiracy set out in the bill of complaint. Competent authority may grant franchises or a franchise to others to construct and operate other lines ·of railroad, one or more, from the Bronx to the Battery, and the grantees of such franchises will be at liberty to construct and operate other roads. But, in my judgment, we are to give no such strict meaning to the word "monopoly" as used in section 7 of the stock corporation law, state of New York (Laws 1890 p. 1069, c. 564, amended by Laws 1892, p. 1828, c. 688). The section reads:

"Combinations abolished. No domestic stock corporation and no foreign corporation doing business in this state shall combine with any other corporation or person for the creation of a monopoly or the unlawful restraint of trade or for the prevention of competition in any necessary of life."

If the section applies to railroad corporations at all, and I do not doubt that it does, it must have been intended to prevent the creation of a monopoly by such corporations, and those controlling them, in the business in which they are engaged or authorized to engage by the power creating them and defining their powers and the extent thereof. Railroad companies are not at liberty to construct and operate their lines anywhere and everywhere all over the state, but are confined to particular routes and territory. They are not at liberty to engage in all kinds of business, but are confined, generally speaking, to the transportation of passengers, baggage, and freight. Use the word in any such sense as I have mentioned, and it would be impossible for chartered railroad companies to create a monopoly. We must therefore give to the statute quoted a common-sense meaning and construction, such a construction as will make it effective to prevent the evils aimed at, if its words will permit such construction.

The Century Dictionary thus defines "monopoly": "An exclusive privilege to carry on a traffic." However, it further says: "(5) The possession or assumption of anything to the exclusion of other possessors: thus a man is popularly said to have a monopoly of any business of which he has acquired complete control." But even as first defined, "an exclusive privilege to carry on a traffic," the combination made, as described in the bill of complaint, constitutes a monopoly. The right given by the Legislature and city to each of the companies was, as to its line and territory, exclusive. There could be no com-

petition except by a further legislative grant to some other company. When these companies combined, they combined their exclusive privileges, and had an actual exclusive right to construct and operate railroads and transport passengers by railroad in and over that territory and the exclusive privilege to carry on that traffic. The combined action of the Legislature and capitalists was and is necessary to destroy or affect that right, unless the combination was prohibited by statute. I think this just such a monopoly as was aimed at by the Legislature. The Legislature has permitted one railroad corporation to purchase and own the stock of another; it permits or did permit one company to operate others; but it has limited and restricted that right by absolutely forbidding and declaring illegal the combination of one stock corporation, including railroad corporations, with another stock corporation "for the creation of a monopoly, or the unlawful restraint of trade, or for the prevention of competition in any necessary of life." This, in my judgment, includes a monopoly in the real ownership, control, and management of competing parallel railroad lines between substantially the same points or localities, whereby there is no incentive to regulate or lower fares, or better the cars, or service, or transportation facilities for the accommodation and better service of the public. Here, by this combination, the Interborough-Metropolitan Company absolutely controls and practically owns all the railroad lines, elevated, surface, and subway, between the Bronx and the Battery, subject only to such control as the Public Service Commission may exercise over it, and consequently absolutely and exclusively controls the transportation of passengers and such baggage as they may carry and the business of operating railroads between the points named. The operation and management of railroads in carrying passengers is a business; it is a part of trade and commerce. United States v. Joint Traffic Association, 171 U. S. 505, 570. The court said, 171 U. S. 570, 19 Sup. Ct. 25, 32, 43 L. Ed. 259:

"The building and operation of a railroad thus required a public franchise. The state would have had no power to grant the right of appropriation unless the use to which the land was to be put was a public one. Taking land for railroad purposes is a taking for a public purpose, and the fact that it is taken for a public purpose is the sole justification for taking it at all. The business of a railroad carrier is of a public nature, and in performing it the carrier is also performing to a certain extent a function of government which, as counsel observed, requires them to perform the service upon equal terms to all. This public service, that of transportation of passengers and freight, is a part of trade and commerce, and when transported between states such commerce becomes what is described as interstate, and comes, to a certain extent, under the jurisdiction of Congress by virtue of its power to regulate commerce among the several states."

In San Diego Water Co. v. San Diego Flume Co., 108 Cal. 549, 41 Pac. 495, 29 L. R. A. 839, the court defined monopoly as signifying "the sole power of dealing in a particular thing or doing a particular thing, either generally or in a particular place." In Herriman et al. v. Menzies, 115 Cal. 16, 44 Pac. 660, 46 Pac. 730, 35 L. R. A. 318, 56 Am. St. Rep. 81, the court held that a certain combination did not constitute a monopoly—

"there being nothing to show that the parties to the contract by the combination of their business interests are in the control of that business in San

Francisco to an extent to enable them to exclude competition therein, or control the price of such labor or business."

Here we have the elements of a monopoly, there lacking, as the bill shows that the combination is in the exclusive control of the business of constructing, repairing, managing, and operating railroads and transporting passengers by railroad between the Bronx and the Battery and intermediate points in the city of New York so as to absolutely exclude competition in that business in that place or territory. No individual or corporate agencies can prevent. Legislative action is impotent unless capital shall come to the rescue and ask leave to construct a competing line.

In Northern Securities Co. v. United States, 193 U. S. 197, 363, 24 Sup. Ct. 436, 467, 48 L. Ed. 679, Mr. Justice Brewer said:

"It must also be remembered that under present conditions a single railroad is, if not a legal, largely a practical, monopoly, and the arrangement by which the control of these two competing roads was merged in a single corporation broadens and extends such monopoly. I cannot look upon it as other than an unreasonable combination in restraint of interstate commerce—one in conflict with state law, and within the letter and spirit of the statute and the power of Congress."

In Herriman v. Menzies, supra, the court said:

"A monopoly exists where all or so nearly all of an article of trade or commerce within a community or district is brought within the hands of one man or set of men as to practically bring the handling or production of the commodity or thing within such single control, to the exclusion of competition or free traffic therein."

In Jones v. Carter (Tex. Civ. App. 1907) 101 S. W. 514, the court said:

"The word 'monopoly' embraces any combination or contract, irrespective of its form, the tendency of which is to prevent competition in its broad and general sense, and to control prices to the detriment of the public."

In Burrows v. Int. Met. Co. (C. C.) 156 Fed. 389, 392, Judge Holt held:

"A monopoly exists within the meaning of section 7, Stock Corporation Law, when every surface street, elevated, and subway railroad, in a locality are combined into one management and control, through corporate stock ownership."

This combination would have been legally impossible under Railroad Corporation Law, section 80 (Laws 1892, p. 1398, c. 676), which reads:

"Consolidation and lease of parallel lines prohibited. No railroad corporation or corporations owning or operating railroads whose roads run on parallel or competing lines, except street surface railroad corporations, shall merge or consolidate, or enter into any contract for the use of their respective roads, or lease the same, the one to the other, unless the Board of Railroad Commissioners of the state or a majority of such board shall consent thereto."

But, evidently, an attempt was made to evade this by organizing certain of the companies under the business corporation law, viz., Interborough-Metropolitan Company and Metropolitan Securities Company. It should be remembered here that section 7 of the stock corporation law evidently limits section 40 thereof.

My attention has been called to certain litigation in the state courts of the state of New York holding against the contentions of the plaintiff herein, and I am asked to follow the decisions there made as binding on this court. Matter of Application of Attorney General, etc., 125 App. Div. 804, 110 N. Y. Supp. 186, and cases cited; Matter of Application of Attorney General, 124 App. Div. 401, 108 N. Y. Supp. 823. On the facts alleged in this bill I do not see how the Appellate Division could have arrived at any such conclusion as it did in the case cited. Probably the facts alleged here did not appear there. Section 78, c. 565, p. 1106, Laws 1890, relates to the lease of one road to another; section 79 provided that one leasing another might acquire stock therein; but the following section, section 80, expressly provided that:

"Consolidation and lease of parallel lines prohibited. No railroad corporation or corporations owning or operating railroads, whose roads run on parallel or competing lines, shall merge, or consolidate, or enter into any contract for the use of their respective roads, or lease the same the one to the other."

Sections 78 and 80 were amended by chapter 676, p. 1398, Laws 1892, and, as amended, section 80 read as quoted. All these companies were not "street surface railroad corporations," and the bill expressly alleges that the Board of Railroad Commissioners of the state did not assent to the merger, consolidation, or agreement alleged and complained of in the bill. The bill alleges a bald violation of both the railroad corporation law and the business corporation law as they stood at the time of the doing the acts complained of. I am not at all impressed by the contention that a monopoly cannot exist where it is within the power of the Legislature, by legislative enactment, or the operations of some commission created by it, to remedy, obviate, destroy, or alleviate the evils that would or might result from the monopoly if left undisturbed. A monopoly is no less a monopoly for the reason that legislative power, if exercised, may destroy it, or regulate it, or lessen the evils of its existence. The power of the state to destroy a monopoly or a combination in restraint of trade does not negative its existence. The power of the courts, conferred by Congress, to dissolve combinations, etc., in restraint of interstate commerce affords no argument against existence of such a combination. A monopoly may exist even if fares may be fixed by the Legislature.

The highest court of the state of New York is our Court of Appeals, and when that court construes section 7 of the stock corporation law the federal courts will be bound by its construction. The federal courts are not bound by any decision of any Appellate Division of the Supreme Court of the state in any case. The Appellate Divisions cannot convert themselves into the highest court of the state or into courts of "last resort," within the meaning of the cases, by refusing appeals to the Court of Appeals or by exercising a discretion in refusing leave to prosecute actions. The lower federal courts are bound by the decisions of the highest court of a state giving construction to the Constitution or statutes of the state, except when the United States Supreme Court has decided otherwise, but are not bound by its decision on questions of general commercial law, etc. They are also bound by

the decisions of the Supreme Court of the United States and those of the Circuit Court of Appeals in their own circuit, but are not bound by those of a federal court of co-ordinate jurisdiction, or even the decisions of a federal Circuit Court of Appeals in another circuit. Courts are not mere machines to register and follow the opinions and decisions of some other court, unless that other court be one having appellate power in the same jurisdiction, or the highest court of a state and the decision gives construction to the Constitution or some statute of the state and the Supreme Court of the United States has not, as it sometimes does, decided in opposition to it. Of course, all these courts are entitled to consideration and are held in the highest respect, and their decisions are to be carefully considered and duly weighed, but, aside from appellate courts of the same jurisdiction and the highest court of a state in certain cases, such decisions are not binding on the Circuit or District Courts of the United States. The decision of one of the several Appellate Divisions in the state of New York is not binding on another, but all Appellate Divisions are, or should be, bound by the decision of the Court of Appeals. So the decision of one of the several Circuit Courts of Appeal in the federal courts is not binding on another, or even on the Circuit or District Courts of another circuit. How far one court shall be bound by another of co-ordinate jurisdiction is a question of comity, and on this question the Supreme Court of the United States has spoken in no uncertain terms. Mast. Foos & Co. v. Stover Manufacturing Co., 177 U. S. 485, 488, 489, 20 Sup. Ct. 708, 710, 44 L. Ed. 856, where Mr. Justice Brown, speaking for the court, said:

"Comity is not a rule of law, but one of practice, convenience, and expediency. It is something more than mere courtesy, which implies only deference to the opinion of others, since it has a substantial value in securing uniformity of decision and discouraging repeated litigation of the same question. But its obligation is not imperative. If it were, the indiscreet action of one court might become a precedent, increasing in weight with each successive adjudication, until the whole country was tied down to an unsound principle. Comity persuades, but it does not command. It declares not how a case shall be decided, but how it may with propriety be decided. It recognizes the fact that the primary duty of every court is to dispose of cases according to the law and the facts; in a word, to decide them right. In doing so, the judge is bound to determine them according to his own convictions. If he be clear in those convictions, he should follow them. It is only in cases where, in his own mind, there may be a doubt as to the soundness of his views, that comity comes in play and suggests a uniformity of ruling to avoid confusion until a higher court has settled the law. It demands of no one that he shall abdicate his individual judgment, but only that deference shall be paid to the judgments of other co-ordinate tribunals. Clearly, it applies only to questions which have been actually decided, and which arose under the same facts."

When, as here, we come to questions involving the proper construction of a state statute, if they do not involve the question of its being in violation of the Constitution of the United States, the decisions of the highest state court are, with the limitation stated, binding; but it must be the decision of the highest state court. Ex parte Tyler, 149 U. S. 137, 13 Sup. Ct. 785, 37 L. Ed. 697; City of Denver v. Porter, 126 Fed. 288, 61 C. C. A. 168; Morenci Copper Co. v. Freer (C. C.) 127 Fed. 199.

In Ex parte Tyler, supra, the court said:

"When the questions involved arise under the state Constitution and laws, the decisions of the highest tribunal are accepted as controlling."

Such is the holding in Oakes v. Mase. 165 U. S. 363. 17 Sup. Ct. 345, 41 L. Ed. 746. In Montana its Supreme Court is its highest court and court of "last resort." The same is true of Yazoo and M. R. R. Co. v. Adams, 181 U. S. 580, 21 Sup. Ct. 729, 45 L. Ed. 1011.

There may be, and, perhaps is, an exception, where the inferior courts of a state, by a long and uniform course of decision, have established rules which have become rules of property and action in the state, especially with regard to the law of real estate and the construction of its state Constitution and statutes, in which case, to avoid confusion and a disturbance of the settled law of the state and of settled rights, the federal courts may follow them if apparently sound. Burgess v. Seligman, 107 U. S. 20, 33, 2 Sup. Ct. 10, 27 L. Ed. 359, quoted with approval in Great Southern Hotel Co. v. Jones, 193 U. S. 542, 543, 24 Sup. Ct. 576, 48 L. Ed. 778. But such a rule would be showing more regard to the decisions of the inferior courts of a state than does the highest court of such state, which never hesitates to overturn the decisions of its inferior courts even on questions involving the Constitution and statutes of such state. But it is unnecessary to discuss this proposition, as we have no uniform course of decisions on the question involved here by the inferior courts of the state of New York. The whole duty of this court in this particular case is summed up by Mr. Justice Harlan in Great Southern Hotel Co. v. Jones, 193 U. S. 548, 24 Sup. Ct. 580, 48 L. Ed. 778, where he says:

"But the decision of the state court, as to the constitutionality of the statute in question, having been rendered after the rights of parties to this suit had been fixed by their contracts, the Circuit Court would have been derelict in duty if it had not exercised its independent judgment touching the validity of the statute here in question. In making this declaration we must not be understood as at all qualifying the principle that, in all cases, it is the duty of the federal court to lean to an agreement with the state court, where the issue relates to matters depending upon the construction of the Constitution or laws of the state."

For these reasons, this court is at liberty and in duty bound to follow its own best judgment and give its own construction to the statute in question, the New York Court of Appeals not having passed upon the question.

It is urged that there has not been a sufficient compliance with equity rule 94, promulgated January 23, 1882, and framed in the light of Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827. And see Corbus v. Alaska T. G. M. Co., 187 U. S. 462, 23 Sup. Ct. 157, 47 L. Ed. 259; Venner v. Great Northern Railway, 209 U. S. 24, 33, 28 Sup. Ct. 328, 52 L. Ed. 666. That rule provides that every bill brought by one or more stockholders in a corporation against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must (1) be verified by oath; (2) contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or, etc.; (3) that the suit is not a collusive one

165 F.—61

to confer on a court of the ²United States jurisdiction of a case of which it would not otherwise have cognizance; (4) it must set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders; and (5) the cause of his failure to obtain such action.

It seems to me that the allegations of the bill are sufficient in these regards. First, the bill is verified by Clarence H. Venner, the president of the Continental Securities Company, which company is a stockholder and the plaintiff in the action, and Venner gives the grounds and sources of his information and belief. Second, the bill says the complainant "was, at and prior to the time of the unlawful plan, combination, and conspiracy which are hereinbefore set forth, and now is, the bona fide and lawful owner, of record, of 300 shares, of the par value of $100 each, of the capital stock of the defendant Interborough Rapid Transit Company," one of the companies that entered into the combination and alleged conspiracy. Third, the bill says "this suit is not a collusive one to confer on a court of the United States jurisdiction of a cause of which it would not otherwise have cognizance." Fourth, the bill then alleges that the plaintiff made a demand July 25, 1906, on the Interborough Rapid Transit Company, and August Belmont, its then president, and on its board of directors, that the company take steps to dissolve the said illegal combination and monopoly, wrest the control of said company from the Interborough-Metropolitan Company, and restore the control of, and the property and franchises of, the said Interborough Company to its stockholders, and attaches to the bill a copy of the demand which was in writing. The bill also alleges that this same demand, giving it, was repeated July 10, 1907, and the bill gives in detail the reasons why he failed to secure such action.

Criticism is made of the allegation as to ownership of the shares of stock, in that it states the plaintiff was at the time of the transaction complained of, and now is, the bona fide and lawful owner "of record" of the shares of stock mentioned. The plaintiff certainly states emphatically that he was a bona fide and lawful shareholder of record at the time of the transaction of which he complains, and he emphasizes the fact by stating that his shares of stock were recorded in his name; that he was the bona fide and lawful owner of record. I do not see that the allegations that plaintiff was the bona fide and lawful owner "of record" detracts anything from the force of the statement. I do not think the statement evasive, or that it was so intended. It is not to be implied from such a statement that while complainant was and is the bona fide lawful owner of the stock, of record, some other person was and is the real owner, legal or equitable in fact. I think an allegation that a plaintiff is the bona fide and lawful owner of record of certain real estate is a direct and emphatic allegation of absolute and unqualified ownership. I am of opinion that a statement that a person is the bona fide and lawful owner of record of certain stock in a corporation raises the presumption that he is the sole, actual, bona fide, and lawful owner thereof, both legal and equitable, and that no other person has any interest therein. It is true that

certificates of ownership of shares of stock in a corporation may pass by indorsement and delivery and carry the ownership of the stock itself; that shares of stock may be recorded in the name of one man and be actually owned by another. If it shall turn out on the trial that Venner has adopted a subterfuge, has alleged an ownership of this stock "of record" in the plaintiff company, when in fact the stock was owned by some other person or corporation, the complainant will not get far in his action. This ownership is the foundation of the right of complainant to maintain this action at all, and if that allegation is put in issue the plaintiff will undoubtedly be put to proof thereof in the very beginning. I have examined all the cases cited by the defendants, and find nothing opposed to the views here expressed. Equity rule 94 by its very terms—and it is as binding as an express statute—requires the complainant in such an action as this to allege that he was a shareholder at the time of the transaction of which he complains. I have no doubt that "a bona fide owner of stock, of record," in a corporation, is a "shareholder" therein. "Shareholder: One who holds or owns a share or shares in a joint stock or incorporated company, in a common fund, or in some property; as a shareholder in a railway, a mining or banking company, etc." "Share: * * * Specifically, one of the whole number of equal parts into which the capital stock of a trading company or corporation is or may be divided; as shares in a bank, shares in a railway." And, in finance, "stock" is "the share capital of a corporation or commercial company; the fund employed in the carrying on of some business or enterprise, divided into shares of equal amount, and owned by individuals who jointly form a corporation." Century Dictionary. Undoubtedly the bona fide owner of record of 300 shares of the capital stock of a duly incorporated railroad or business corporation is "a shareholder" therein. I think that equity rule 94 was complied with when the complainant stated facts which show that it was "a shareholder" in the company at the time of the transaction complained of. It is, of course, true that "a stockholder is one owning stock" (Mills v. Stewart, 41 N. Y. 384, 386), but, as stock in a corporation is a share or shares in the corporation and represents and entitles the holder thereof to a part or share of the fund put into and employed in carrying on the business, a stockholder or one owning stock is necessarily a shareholder. There is nothing to the contrary in Beal v. Essex Savings Bank, 67 Fed. 816, 817, 15 C. C. A. 128, which simply holds that one who holds stock as collateral security does not own the stock and is not a shareholder, but that the one who does own the stock and has simply pledged it as security for a debt, does own it and is consequently a shareholder; or in Matter of Bronson, 150 N. Y. 1, 8, 44 N. E. 707, 34 L. R. A. 238, 55 Am. St. Rep. 632, or Matter of Fitch, 160 N. Y. 87, 94, 54 N. E. 701. Both cases demonstrate that the ownership of shares of stock in a corporation makes the owner a shareholder therein, while ownership of its bonds does not; the certificate issued is mere evidence of the number of shares the holder is entitled to; the record of ownership of shares on the books of the company is evidence of the fact as against the company and even others, sometimes, but, nevertheless, the owner may have actually sold his shares and ceased to be

in fact a shareholder and stockholder. McNeil v. Tenth National Bank, 46 N. Y. 325, 331, 7 Am. Rep. 341. The certificates of stock ownership are not the stock itself or the shares of the capital itself, but mere evidence of ownership of so many shares of the money put in the business as capital stock. I find no case, and am not cited to one, holding that such an allegation as that contained in the bill is not a compliance with the rule referred to. The allegation fairly means that the complainant was at the time referred to, not only the bona fide owner of the shares, or shares of stock of the company, but the recorded owner. It was not necessary for the pleader to use the very words of the rule.

The next contention in support of the demurrers is that the bill shows on its face a fatal defect of parties, in that the receivers appointed by the Circuit Court of the United States in the Southern District of New York are not made parties defendant. It is further contended that the present possession, control, and management of certain of the properties mentioned having passed into the hands of such receivers, the arm of this court, and consequently into the possession of this court itself, this action cannot be maintained. The bill explicitly alleges that all the surface railroads mentioned are in the hands of receivers appointed by Judge Lacombe in actions brought in this court and now pending herein, and which action was taken prior to the commencement of this action, and are being held, operated, and controlled by such receivers. The bill states that, as to the New York City Railway Company and the Metropolitan Street Railway Company, such action was taken "because of the then admitted inability of" said companies, naming them, "to pay and discharge its financial obligations which were then due or about to become due." As to the Third Avenue Railroad Company, the receivers were appointed in an action brought in this court to foreclose a mortgage on its property. The bill gives no further information as to the nature or object of these several actions.

The contention in defendants' brief seems to be that, as the court has assumed the administration of these surface railroads, their control and management, as the possession of the receivers is the possession of this court, and it holds and administers—that is, operates— the surface roads for the benefit of those persons or corporations which the court shall ultimately adjudge to be entitled to it, and as these surface roads are in the custody of the law (Porter v. Sabin, 149 U. S. 473, 479, 13 Sup. Ct. 1008, 37 L. Ed. 815; Atlantic Trust Co. v. Chapman, 208 U. S. 360, 370, 28 Sup. Ct. 406, 52 L. Ed. 528), it is self-evident that the Interborough-Metropolitan Company is not now violating section 7 of the stock corporation law hereinbefore quoted.

The gist of this contention seems to be that the action of this court in appointing receivers for the surface roads has taken them out of the illegal combination or monopoly, if one existed, and that it is already dissolved, as we now have competing parallel lines between the Battery and the Bronx, and no restraint of trade or business as competition is restored. I do not consider this to be the result of the

action of the court in appointing these receivers. The same contracts and agreements and stock issues and ownerships exist as heretofore. The court, in administering the affairs of the companies and in running and operating the roads, must recognize and treat such contracts, etc., as valid and subsisting. This court, by its receivers, has stepped in and taken possession, and must run and operate and manage the roads in conformity to existing contracts, agreements, stock ownerships, etc., and not in opposition thereto, subject, of course to its right in a proper proceeding to abrogate improvident contracts and direct proceedings to set aside illegal ones, etc. The court must recognize and treat as valid these contracts, agreements, and recognize these conditions, until they are assailed and set aside. The court may vacate these receiverships at any moment, and in such event the property and its control would be restored to those from whom it was taken or their successors. The duties of a receiver are substantially those of a trustee, although his powers are usually more limited. 1 Foster's Fed. Pr. § 250. p. 556; and see Commonwealth v. Franklin Ins. Co., 115 Mass. 278; People v. National T. Co., 82 N. Y. 283. Suppose business conditions should be such that large earnings accumulate in the hands of such receivers applicable to the payment of dividends, would or would not these go to the persons entitled thereto under the alleged illegal consolidation agreement? As was said by Clifford, J., in Bank of Bethel v. Pahquioque Bank, 14 Wall. 400, 20 L. Ed. 840, as to the effect of the appointment of receivers, "the corporate franchise of the corporation is not dissolved, and the association. as a legal entity, continues to exist." It is possible that these cases in which receivers were appointed, properly, might be consolidated with this, or that the court might instruct the receivers to ignore the alleged illegal combination, etc. However, it has not done so, and the right of this complainant to have the illegal combination dissolved, if it has such right, is not even suspended by the pendency of the actions referred to.

As to parties, we find all the corporations and individuals who took part in the alleged illegal transaction, or who are to be directly affected by a decree, before the court. The complainant sues in behalf of all similarly situated who see fit to come in. The receivers do not own the property or any part of it. They are not indispensable parties, or even necessary parties, to this action. In my judgment they would be proper parties, as the pendency of this action and the information contained in the bill, if brought to their attention and to the attention of the judge appointing them, might affect their action or that of the court when giving them directions. An application to intervene or to have them brought in would properly be brought before Judge Lacombe, who would exercise his judgment and discretion in the matter.

If it be a defense, as to which I express no opinion, that this vast combination, affecting the population of a city having some four millions of people and other millions who visit the city for business or pleasure, taking under one management and control and ownership all its parallel and heretofore competing railroad lines, with their

feeders, is a benefit to the stockholders and the public, and that no injury has resulted or can result, that defense may be pleaded and the facts shown. The allegations of the bill are that injury has resulted and must result; that the rights of the public and of many stockholders have been invaded; that the statutes of the state, expressing the legislative will and the policy of the state, have been and are being violated; that the combination described is illegal and injurious. Concede the premises, and we have a proper case for the interposition of a court of equity. Whether the policy expressed in the statutes be wise or unwise is a question with which the courts have nothing to do. It is their duty to ascertain the law, and, when appealed to, to declare and enforce it.

The demurrers are overruled, with costs. Defendants may answer in 30 days on payment of such costs, to be taxed by the clerk.